[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 10-13595

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEB 29, 2012
JOHN LEY
CLERK

D.C. Docket No. 3:07-cv-00347-RV-EMT

ROGER ALLEN ROZZELLE,

Petitioner-Appellant,

versus

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(February 29, 2012)

Before HULL, MARCUS and BLACK, Circuit Judges.

PER CURIAM:

Roger Allen Rozzelle appeals the district court's denial of his untimely 28 U.S.C. § 2254 petition challenging his Florida second-degree murder conviction. After review and oral argument, we affirm.

## I.  BACKGROUND

An information charged Petitioner Rozzelle with one count of second-degree murder, in violation of Florida Statutes § 782.04(2).  This appeal centers around the "depraved mind" mens rea in § 782.04(2), which defines second-degree murder as "[t]he unlawful killing of a human being, when perpetrated by any act imminently dangerous to another and evincing a depraved mind regardless of human life, although without any premeditated design to effect the death of any particular individual."  Fla. Stat. § 782.04(2).  In a 1999 trial, a jury convicted Rozzelle of second-degree murder.  We review the abundant trial evidence establishing that Rozzelle brutally beat and killed the victim, Greg Leier.

### A.  1999 Trial and Conviction

On July 17, 1998, Petitioner Rozzelle and his girlfriend, Andrea Barnes, checked into room 225 of a motel in Fort Walton Beach, Florida.  At the motel, they met the victim, Greg Leier, who was staying next door in room 226.  Leier had arrived several days earlier and had lent his car and credit cards to Tracey

2

Feagin, who was staying at a nearby motel with her boyfriend, Corey Cox.

At 5:00 p.m., Petitioner Rozzelle went to a bar to meet his brother, Anthony Rozzelle. Barnes stayed behind at the motel. Petitioner's brother Anthony testified that Petitioner stayed with him at the bar until 6:00 p.m., when Petitioner left to check on Barnes. Around 6:00 p.m., Petitioner Rozzelle returned to the motel, where he saw Leier and Barnes in what Petitioner believed to be a sexual encounter.[1] Petitioner claimed that he "[k]nocked them out."

Petitioner Rozzelle returned to the bar and told his brother Anthony that Petitioner had "caught" Barnes with Leier, "cold-cocked" both of them, "[k]nocked them out," and dragged Barnes to his room and locked the door. Anthony testified that Petitioner was "[n]ot excited" when he described these events. The brothers stayed at the bar until about 9:00 p.m. Anthony drove Petitioner part of the way back to the motel, then "let him have his car and go on his way." Anthony told Petitioner to go back to the motel and go to sleep and "don't get in trouble and don't go to jail."

Around 9:00 p.m., Rozzelle returned to the motel and observed Leier and Barnes standing together on the motel balcony. Rozzelle then beat Leier and

_____

[1] The record does not clearly show where Leier and Barnes were when Rozzelle first saw them together after he returned to the motel around 6:00 p.m.

Barnes again. Leier died from his injuries that night.

That same evening, witnesses Adley Boudreaux and Dawn Cortie were staying in room 221. Both Boudreaux and Cortie testified that around 8:00 or 8:30 p.m., they were at the motel pool and saw Petitioner Rozzelle drive up, get out of his car quickly, run up the stairs, and beat on the door to room 226, demanding to be let in. At some point, Boudreaux left the pool and returned to room 221. On his way, he saw Petitioner Rozzelle enter room 226. Then Boudreaux heard a female voice "hollering, something about, stop, stop, you know. Don't do that. Leave him alone." Boudreaux went into his room.

Motel employee Harish Chauhan testified that the occupant of room 226 phoned the motel front desk asking for security. Minutes later, Chauhan left the motel office and observed Leier, whose face was covered with blood, walking down the stairs. Leier asked Chauhan to call the police. Chauhan returned to the motel office and asked another motel employee to call the police.

At 9:26 p.m., police officer John Burritt responded to the call of battery-already-occurred. He arrived at the motel at 9:28 p.m. As he stepped out of the patrol car, Officer Burritt heard a voice say, "I'm over here." The victim Leier approached Officer Burritt from the shadows of the ground floor of the motel. Burritt described Leier as having suffered a brutal beating. Leier was "staggering

4

and hunched over," had "blood pouring out of his mouth" and his head "almost looked twice the size of a normal human being" due to "massive swelling." Burritt testified, "I was shocked because I'd never seen anybody beaten so badly in my life." Burritt explained that "[y]ou could tell he was in severe pain and he was having difficulty breathing and having difficulty talking." Leier told Officer Burritt that the person who beat him was upstairs and brought Burritt to room 225. Leier said, "he's in there." Officer Burritt sent Leier to room 226 and knocked on the door to room 225. Petitioner Rozzelle answered. Officer Burritt saw Barnes in the room, and she was bleeding.

Officer Mary Blythe Williams arrived at the motel shortly after Officer Burritt. Officer Williams testified that Barnes "had blood all over her face, around her nose." According to Officer Williams, Barnes's "teeth had been knocked out to just below the gumline" so that "[t]here was just a little tiny bit of white showing up underneath her gumline."

Officer Burritt arrested Petitioner Rozzelle at the motel. Burritt testified that as he and Rozzelle walked past Leier's room, Rozzelle looked in and stated, "that's right, you motherfucker, I kicked your ass, I caught you fucking my old lady, I kicked your ass." Officer Williams also heard Rozzelle make this statement. Officer Burritt put Rozzelle in the back of Burritt's patrol car and

5

transported Rozzelle to the police station. Officer Burritt testified that, during the trip, Rozzelle stated, "I caught that guy fucking my old lady and I beat the hell out of him. I'm from the old school and he had it coming."

At the police station, Petitioner Rozzelle made a taped statement that was introduced at trial. In the statement, Rozzelle said, "I love this woman," and he "whupped [Leier's] ass" after seeing Leier and Barnes together after returning from the bar the second time and "didn't have no second thoughts about it." Rozzelle continued:

> You're lucky this [foot] wouldn't fit up his ass or it would have been there, too. That's all I can say. The guy got — he deserved an ass whupping, and I put one on him and I don't feel sorry about it. The only thing that I didn't do to that motherfucker is throw him off the balcony, and if I had probably thought about it, I would have done that, too.

In his taped statement, Rozzelle stated that he had used only his fists to beat Leier. Rozzelle struck Leier with "[a] couple of good left hooks . . . probably three or four . . . [and a] couple of right crosses, too."

Rozzelle also indicated that, during or shortly after he beat Leier, Barnes went into her room and locked the door, and Rozzelle had to go downstairs to the motel office to get another key. The police "were there pretty quick," about "two or three minutes" after Rozzelle went to the motel office.

Emergency Medical Technician ("EMT") Brian Hughes treated the victim

6

Leier at the motel. Hughes testified that Leier stated that he was hit with a fist and indicated that he was not hit with any other objects. Hughes testified that Leier lost consciousness at the motel.

Around 10:00 p.m., Leier arrived at the hospital. Dr. Carl Glidden, who treated Leier, testified that Leier was unconscious and neurologically unresponsive upon Leier's arrival at the emergency room. Dr. Glidden explained that Leier's brain "was more or less like jello at that time, no form or function to it." Dr. Glidden opined that Leier's injuries "could be consistent" with a beating from a person's fists.

Dr. Bruce Witkind, a neurosurgeon, testified that Leier was brain dead when Dr. Witkind examined Leier at the hospital. According to Dr. Witkind, a CT scan showed massive bleeding on the left side of Leier's brain and under his skull, and these injuries were consistent with a beating from a man's fists.

Dr. Michael Berkland, the Associate Medical Examiner, performed Leier's autopsy. Dr. Berkland testified that Leier's injuries included bruises around the eyes, face and mouth, and on the scalp, chest, both arms and back. Leier's internal injuries included deep bruises extending to the muscle tissue. Leier's blood alcohol level was approximately 0.40. Dr. Berkland stated that Leier's injuries were consistent with a beating from a man's fists but acknowledged that some of

Leier's injuries could have been caused by something else, for example, falling against a hard surface.

At trial, Petitioner Rozzelle's defense was that, several minutes after he beat Leier the second time, Corey Cox, who had visited the motel with Feagin on a different day but did not know Leier, entered the motel room and administered the final and fatal blows to Leier. Defense counsel argued to the jury that there was a reasonable doubt as to whether Rozzelle was the person responsible for Leier's death. In his closing argument, defense counsel noted that, after Leier was beaten, Rozzelle's knuckles were uninjured except for one small scratch and police found no blood on the shoes and shirt Rozzelle was wearing. Defense counsel also argued that Leier's statement, that Rozzelle beat him, was unreliable because Leier was extremely intoxicated and his brain was injured by the beating. Defense counsel attributed Rozzelle's incriminating statements after the beating to Rozzelle's anger. Rozzelle did not testify at trial.

The prosecution argued to the jury that Rozzelle administered the fatal beating and that Rozzelle should be convicted of second-degree murder and not manslaughter. The prosecution did not refer to heat of passion or excusable homicide in its closing argument.

At the close of the prosecution's case, Rozzelle's counsel moved for a

8

judgment of acquittal on the ground that the State had not shown a prima facie case that Rozzelle's acts actually caused Leier's death and that the State had shown only a battery.[2] The Florida trial court denied Rozzelle's motion.

The Florida trial court instructed the jury not only about second-degree murder, but also about the lesser included crime of manslaughter and about "excusable" homicide. There were no objections to the following instructions.

As to second-degree murder, the Florida trial court instructed the jury that the State must prove these three elements beyond a reasonable doubt in order for the jury to convict Rozzelle of second-degree murder: (1) "Greg Leier is dead"; (2) "the death was caused by the criminal act of Roger Allen Rozzelle"; and (3) "there was an unlawful killing of Greg Leier by an act imminently dangerous to another and demonstrating a depraved mind without regard to human life." See Fla. Stat. § 782.04(2).

The Florida trial court then instructed that if second-degree murder was not proved, the jury would decide if Rozzelle was guilty of the lesser included crime

---

[2] Rozzelle's counsel's argument on Rozzelle's motion for a judgment of acquittal was: Your Honor, at this time the defendant would make a motion for directed verdict of acquittal. I would state that the state has failed to prove a prima faci[e] case against the defendant. At best they've shown that the defendant has committed battery, but they have not shown that he committed the acts that actually resulted in Mr. Leier's death. For that reason, Your Honor, we would ask that the court direct a verdict of not guilty.

of manslaughter.  In this event, the court instructed that the State must prove these two elements in order for the jury to convict Rozzelle of manslaughter: (1) "Greg Leier is dead"; and (2) "Roger Rozzelle intentionally caused the death of Greg Leier, or Roger Allen Rozzelle intentionally procured the death of Greg Leier, or . . . the death of Greg Leier was caused by the culpable negligence of Roger Allen Rozzelle."  See Fla. Stat. § 782.07(1).[3]

As to "excusable" homicide, the Florida trial court instructed that "[t]he killing of a human being is excusable . . . . [w]hen the killing occurs by accident and misfortune in the heat of passion upon any sudden and sufficient provocation."  See Fla. Stat. § 782.03.[4]

The jury convicted Rozzelle of second-degree murder.  The Florida trial court imposed a sentence of life imprisonment.[5]

## B. Direct Appeal

---

[3] Florida Statutes § 782.07(1) provides that "[t]he killing of a human being by the act, procurement, or culpable negligence of another, without lawful justification . . . and in cases in which such killing shall not be excusable homicide or murder . . . is manslaughter."

[4] Florida Statutes § 782.03 provides:
Homicide is excusable when committed by accident and misfortune in doing any lawful act by lawful means with usual ordinary caution, and without any unlawful intent, or by accident and misfortune in the heat of passion, upon any sudden and sufficient provocation, or upon a sudden combat, without any dangerous weapon being used and not done in a cruel or unusual manner.

[5] Rozzelle had prior Alabama convictions for burglary, sexual assault and sale of controlled substances.

On direct appeal, Petitioner Rozzelle claimed that the evidence was insufficient to convict him of second-degree murder. In particular, Rozzelle argued that the evidence showed that he acted in the heat of passion and therefore he lacked the "depraved mind" intent required for second-degree murder. Rozzelle argued that although the jury was instructed on "excusable" homicide based on heat of passion, "[t]hat instruction goes toward passion which completely negates the killing, making it lawful." Rozzelle argued that the issue on appeal was "a somewhat lesser form of 'heat of passion' — one which negates the depraved mind element of second degree [sic], reducing the offense to manslaughter."

The State responded that Rozzelle waived this manslaughter defense because his trial counsel did not specifically raise the issue of heat of passion in Rozzelle's motion for judgment of acquittal. The State explained that Rozzelle's "argument on appeal, that the evidence showed as a matter of law that the killing was heat-of-passion manslaughter, was not even suggested by counsel below, who argued only [in Rozzelle's motion for judgment of acquittal] that the State failed to prove a prima facie case." In addition, the State argued that there was ample evidence at trial to show that Rozzelle killed Leier "by an act imminently dangerous and evincing a depraved mind."

On December 15, 2000, Florida's First District Court of Appeal affirmed Rozzelle's second-degree murder conviction and life sentence without opinion. Rozzelle v. State, 773 So. 2d 543 (Fla. 1st DCA 2000) (mem.).[6]

## C. Rule 3.850 Motion in 2001–2003

On June 8, 2001, in Florida circuit court, Petitioner Rozzelle filed a pro se motion for post-conviction relief under Florida Rule of Criminal Procedure 3.850. Rozzelle's 3.850 motion claimed that trial counsel was ineffective for not including in Rozzelle's motion for judgment of acquittal "the fact that the state failed to prove deprived [sic] mind" and thereby failing to preserve this issue for appeal.[7] The State responded that Rozzelle's trial counsel was not ineffective for numerous reasons, including there was "ample evidence" at trial showing Rozzelle acted with a depraved mind and was properly convicted of second-degree murder.

After appointing 3.850 counsel for Rozzelle, the Florida circuit court held an evidentiary hearing. Rozzelle's trial counsel testified, inter alia, that he did not argue in his motion for judgment of acquittal that the evidence was insufficient to

---

[6] After his direct appeal, Petitioner Rozzelle did not file a petition for a writ of certiorari in the U.S. Supreme Court.

[7] Rozzelle's 3.850 motion also claimed that (1) trial counsel was ineffective for not moving to suppress Rozzelle's statement to police; (2) Rozzelle's waiver of his right to testify was involuntary; and (3) trial counsel was ineffective for failing to object to the prosecutor's comments in closing argument.

12

show that Rozzelle acted with a "depraved mind" because "[t]here was plenty of evidence that a jury . . . could use to make a finding of that." Although Rozzelle did not testify at trial, he testified at the 3.850 hearing that he caught Leier and Barnes together twice, first at 6:00 p.m. and second at 9:00 p.m., and the second encounter is when he observed Leier "embrace[]" Barnes, saw that "[s]he had on a T-shirt with nothing on underneath" and "went off."

On February 20, 2002, the Florida circuit court denied Rozzelle's 3.850 motion. The circuit court explained that Rozzelle's allegations that his trial counsel was ineffective for failing to raise the "depraved mind" element in Rozzelle's motion for judgment of acquittal were "definitely and certainly without merit." The circuit court continued, "Such a motion would have been obviously denied . . . based on the ample evidence of such intent."

On August 8, 2003, Florida's First District Court of Appeal affirmed the circuit court's denial of Rozzelle's 3.850 motion. Rozzelle v. State, 852 So. 2d 239 (Fla. 1st DCA 2003) (mem.).[8]

## D. State Habeas Petition in 2006

---

[8] On January 24, 2005, Petitioner Rozzelle signed and gave to prison authorities a motion, under Florida Rule of Criminal Procedure 3.800, raising a state-law claim that his Criminal Punishment Code scoresheet was incorrectly calculated. The motion was filed on January 26, 2005. The state trial court denied Rozzelle's 3.800 motion, and Florida's First District Court of Appeal affirmed on June 14, 2005. Rozzelle v. State, 906 So. 2d 1064 (Fla. 1st DCA 2005) (mem.).

13

Almost three years later, Petitioner Rozzelle filed a petition for a writ of habeas corpus in the Florida circuit court. In this March 28, 2006 petition, Rozzelle claimed that the prosecutor "knowingly presented false or purjured testimony" at trial, specifically Officer Mary Blythe Williams's testimony regarding Andrea Barnes's physical condition at the motel after the beating. Williams testified that Barnes's teeth were knocked out, but Rozzelle's state habeas petition alleged that his evidence showed Barnes still had her teeth. This time, Rozzelle did not raise an ineffective-trial-counsel claim.

On April 11, 2006, the Florida circuit court dismissed Rozzelle's habeas petition. The circuit court concluded that "[t]he remedy of habeas corpus is not available to obtain the kind of collateral postconviction relief available by a motion under Fla. R. Crim. P. 3.850 in the sentencing court." See Baker v. State, 878 So. 2d 1236, 1238–46 (Fla. 2004) (holding that, for non-capital defendants, state habeas petitions raising claims that may be raised by 3.850 motion are unauthorized). Further, the Florida circuit court concluded that the time period for Rozzelle's filing a 3.850 motion had long since expired.

On July 27, 2007, Florida's First District Court of Appeal affirmed the circuit court's dismissal of Rozzelle's state habeas petition. Rozzelle v. McDonough, 961 So. 2d 940 (Fla. 1st DCA 2007) (mem.).

14

**D. Federal § 2254 Petition**

On September 5, 2007, Petitioner Rozzelle, pro se, filed this, his first, § 2254 petition and a supporting memorandum shortly thereafter (hereinafter the "§ 2254 petition").[9] Rozzelle's § 2254 petition raised multiple claims, including ineffective assistance of trial counsel as to specific matters.[10] Rozzelle requested that the district court "[r]elease [him] from incarceration, new trial, or remand to state court with instructions to reduce [his] conviction from second degree murder to manslaughter, or any relief this court deems appropriate."

In its answer, the State raised multiple procedural defenses, including Rozzelle's failure to satisfy the one-year limitation period in 28 U.S.C. § 2244(d), established by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), and his failure to exhaust his state court remedies as to claims raised in his § 2254 petition. See 28 U.S.C. § 2254(b)(1)(A).

---

[9] Rozzelle's § 2254 petition itself consisted of a seven-page form petition with an attached statement of issues. In the district court, Rozzelle's supporting memorandum was considered as part of his § 2254 petition, and no objection was made.

[10] As explained later, we ultimately do not reach the merits of Rozzelle's § 2254 claims. For completeness, however, Rozzelle's § 2254 petition alleges that: (1) trial counsel was ineffective by failing to interview or depose certain witnesses, failing to call certain witnesses, and failing to "familiarize himself with the law and facts of the case"; (2) the prosecutor knowingly put false evidence before the jury, specifically, Adley Boudreaux's testimony; (3) the prosecutor, while arguing against Rozzelle's motion for a mistrial, falsely stated that Dr. Carl Glidden would testify concerning Andrea Barnes's injuries; and (4) Officer Mary Blythe Williams's testimony about Barnes's injuries was false or perjured.

15

Apparently recognizing that his § 2254 petition was three years too late, Rozzelle claims in his § 2254 petition that new reliable evidence shows that he is actually innocent of second-degree murder and that his showing of "actual innocence" excuses his failure to exhaust state court remedies and to timely file his first federal habeas petition.

The evidence, which Rozzelle alleges is "new," primarily includes statements by witnesses and Rozzelle himself to law enforcement officers—Officer Burritt, Officer Williams, Detective Thomas Matz and Detective Joseph Michael—which they included in their written police reports back in 1998 but which his trial counsel did not introduce at trial. Rozzelle contends these statements show that (1) he caught Leier and Barnes twice in an intimate encounter and thus beat Leier in the heat of passion; (2) he beat Leier with only his fists; and (3) the beating lasted "only seconds" and was not extended. Rozzelle also submitted Barnes's medical records and a police report addendum documenting Barnes's injuries, which Rozzelle claims contradict Officer Williams's testimony that Barnes's teeth were knocked out. Rozzelle claims that this "new" evidence shows he acted with a lower degree of intent than suggested by the trial evidence and, therefore, if the "new" evidence were introduced, no reasonable juror would have found that he acted with a "depraved mind" and

16

convicted him of second-degree murder. Rozzelle contends the "new" evidence supports only the lesser included crime of manslaughter.

The State responded, <u>inter alia</u>, that (1) Rozzelle had failed to present any "new reliable evidence," as required by <u>Schlup v. Delo</u>, 513 U.S. 298, 324, 115 S. Ct. 851, 865 (1995), and (2) in any event, Rozzelle had not demonstrated his "actual innocence" but was asserting only legal insufficiency of the trial evidence.

## E. Magistrate Judge's Report and Recommendation

The magistrate judge's report and recommendation ("the report") concluded Rozzelle's § 2254 petition was untimely because Rozzelle did not file his petition within one year of the date his conviction became final. Indeed, in this appeal Rozzelle concedes that "[h]e seeks the actual innocence exception because his petition was untimely." <u>See</u> 28 U.S.C. § 2244(d)(1)(A), (D).[11]

---

[11] The magistrate judge properly calculated why Rozzelle's § 2254 petition was not timely filed. Specifically, the magistrate judge found that Rozzelle's Florida conviction became final for purposes of 28 U.S.C. § 2244(d)(1)(A) on March 15, 2001, upon expiration of the 90-day period for seeking a writ of certiorari by the U.S. Supreme Court on direct appeal. The magistrate judge further found that Rozzelle's Florida 3.850 motion, filed on June 7, 2001, (after 83 days of the limitations period had run) tolled the § 2244(d)(1) limitation period until August 26, 2003, when Florida's First District Court of Appeal affirmed the Florida circuit court's denial of Rozzelle's 3.850 motion. <u>See</u> 28 U.S.C. § 2244(d)(2) (providing for tolling during pendency of state post-conviction review). As a result, the § 2244(d)(1) statute of limitations ran 282 days later, on June 4, 2004, more than three years before Rozzelle filed his § 2254 petition.

The magistrate judge also found that the factual predicates of all the evidence Rozzelle referenced in his § 2254 petition "could have been discovered through the exercise of due diligence" before the conclusion of Rozzelle's trial, and thus the one-year time period did not begin running at the time Rozzelle discovered the alleged "new" evidence. 28 U.S.C. § 2244(d)(1)(D).

17

The report noted that Rozzelle could bring his time-barred § 2254 petition only if "new reliable evidence," not presented at trial, showed he was "actual[ly] innocent" and no reasonable juror would have convicted him in light of this new evidence. The report concluded that Rozzelle's evidence was not "new" because the factual predicate for Rozzelle's claims is "based upon facts included in law enforcement reports, witness statements provided to law enforcement, reports of a medical expert who testified at trial, pre-trial depositions, and the trial record." The report also concluded that in any event most of Rozzelle's evidence "was cumulative of evidence presented to the jury at trial," which "overwhelming[ly]" supported the jury's verdict. Though Barnes's medical records were "new," the report found that Rozzelle had not demonstrated that those records "would have been favorable to the defense or likely would have resulted in a different verdict."

## F. District Court's Order

After reviewing Petitioner Rozzelle's objections to the report, the district court "agree[d] with the overall conclusion reached in the [r]eport, but for different reasons." The district court acknowledged that Rozzelle's evidence was not "new" and was "substantively the same as other heat of passion evidence that was admitted at trial." The district court also concluded that Rozzelle had not diligently pursued his actual innocence claim because he "knew of his actual

18

innocence claim . . . certainly no later than March 2000 when he raised the claim on his direct appeal."

The district court, however, did not resolve whether Rozzelle had made the required "actual innocence" showing based on "new reliable evidence." Rather, the district court framed the "pertinent question" as whether a gateway actual innocence exception exists to AEDPA's statute of limitations due to the Suspension Clause. See U.S. Const. art. 1, § 9, cl. 2 ("The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it.").[12] Concluding that no such exception exists, the district court dismissed Rozzelle's § 2254 petition as untimely.

## II.  STANDARD AND SCOPE OF REVIEW

Rozzelle's § 2254 petition and appeal are governed by AEDPA. See Payne v. Allen, 539 F.3d 1297, 1312 (11th Cir. 2008). This Court reviews de novo the district court's dismissal of a § 2254 habeas petition. Arthur v. Allen, 452 F.3d 1234, 1243 (11th Cir.), modified, 459 F.3d 1310 (2006).

The district court issued a certificate of appealability as to "whether there is an 'actual innocence' exception that will equitably toll the AEDPA statute of

---

[12] The district court characterized Rozzelle's actual innocence as "arguable" and assumed without deciding that Rozzelle had made an actual innocence showing in order to reach the question of whether the Suspension Clause nonetheless permitted Rozzelle's untimely petition.

limitations period, and, if so, whether that exception should be available to a petitioner who has failed to pursue his innocence claim diligently." Necessarily subsumed within this question is the threshold issue of whether the petitioner has demonstrated his actual innocence in the first place. Cf. Lawrence v. Florida, 421 F.3d 1221, 1225–26 (11th Cir. 2005), aff'd, 549 U.S. 327, 127 S. Ct. 1079 (2007) (finding questions of applicability of state-impediment and equitable-tolling exceptions to AEDPA statute of limitations were subsumed within certificate of appealability on issue of whether petitioner's § 2254 petition was barred by the AEDPA statute of limitations).

Our inquiry also takes into account the fact that Rozzelle, as appellant, contends that "the district court erred as a matter of law in classifying this case as controlled by the equitable tolling standard" and "injecting a diligence hurdle into Rozzelle's path." Rozzelle's appellate brief emphasizes that he "does not seek to toll the limitations period" but "seeks the actual innocence exception because his petition was untimely." Rozzelle stresses that "[t]he difference between actual innocence and equitable tolling is central to this case." Similarly, in its brief, the State agrees that equitable tolling is an inappropriate doctrine to determine whether actual innocence provides an exception to AEDPA's one-year statute of limitations. Rather, the State argues that there is no actual innocence exception,

20

constitutionally required or otherwise, to AEDPA's limitation period.

Accordingly, our inquiry here is first focused on whether Rozzelle has made a sufficient showing of "actual innocence," and, only if so, whether the Suspension Clause requires a constitutional exception to AEDPA's one-year limitation period for actually innocent petitioners. See, e.g., Johnson v. Fla. Dep't of Corr., 513 F.3d 1328, 1333 (11th Cir. 2008) ("This Court has held that before addressing this difficult constitutional question, we should first consider whether the petitioner can show actual innocence."); Arthur, 452 F.3d at 1244 ("We have held that . . . where the § 2244(d)(1) limitation period has expired and the petitioner is claiming actual innocence, we must first consider whether the petitioner can show actual innocence before we address whether an exception to the limitation period is required by the Suspension Clause of the United States Constitution."); see also Sibley v. Culliver, 377 F.3d 1196, 1205 (11th Cir. 2004) (same); Wyzykowski v. Dep't of Corr., 226 F.3d 1213, 1218 (11th Cir. 2000) (same).[13] We start with AEDPA and what constitutes actual innocence.

_____

[13] In the district court, the State argued that Rozzelle had not shown actual innocence, and the State need not have cross appealed the dismissal of Rozzelle's § 2254 petition to argue that Rozzelle has not demonstrated his actual innocence. See Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1256 (11th Cir. 2001) ("[W]e may affirm [the district court's] judgment on any ground that finds support in the record." (internal quotation marks omitted)); Campbell v. Wainwright, 726 F.2d 702, 704 (11th Cir. 1984) ("[A] party may raise any argument in support of a judgment . . . .").

## III.  DISCUSSION

### A.  AEDPA's Statute of Limitations

AEDPA contains a one-year statute of limitations in which a prisoner convicted of a state crime may file a federal habeas petition.  28 U.S.C. § 2244(d)(1).  Petitioner Rozzelle concedes that his § 2254 habeas petition was not timely filed in 2007 but claims that an actual innocence exception to AEDPA's time-bar exists and argues that he has made a sufficient showing of actual innocence in order for his § 2254 petition to proceed.

Our cases refer to an "actual innocence" claim in at least three different types of habeas cases.  In the first type, a petitioner's actual innocence is itself the constitutional basis of the habeas petition.  See Herrera v. Collins, 506 U.S. 390, 400, 113 S. Ct. 853, 860 (1993) (holding that no federal habeas relief is available for freestanding, non-capital claims of actual innocence); Jordan v. Sec'y, Dep't of Corr., 485 F.3d 1351, 1356 (11th Cir. 2007) (same).  This is not Rozzelle's type of claim.

In the other two types of actual innocence claims, the petitioner's assertion of innocence is not itself a freestanding claim, but merely serves as a "gateway" to get the federal court to consider claims that the federal court would otherwise be barred from hearing.  "To successfully plead actual innocence, a petitioner must

show that his conviction resulted from 'a constitutional violation.'" Johnson, 513 F.3d at 1334 (quoting Schlup v. Delo, 513 U.S. 298, 327, 115 S. Ct. 851, 867 (1995)).

In the second type, a petitioner's actual innocence serves as a gateway to consideration of constitutional claims procedurally defaulted in state court, such as failure to exhaust state remedies, failure to satisfy state filing requirements, et cetera. See Johnson v. Alabama, 256 F.3d 1156, 1171 (11th Cir. 2001) (explaining that claim of actual innocence must be supported by "reliable evidence not presented at trial" (internal quotation mark omitted)); see also Schlup, 513 U.S. at 324, 115 S. Ct. at 865 (holding that for habeas court to consider procedurally barred constitutional claims, petitioner must present "new reliable evidence" of actual innocence). To bypass such a procedural bar, a petitioner must show either (1) cause and prejudice or (2) a miscarriage of justice, or "actual innocence." Schlup, 513 U.S. at 314–15, 115 S. Ct. at 860–61. The actual innocence exception to the procedural bar is not meant to remedy ordinary errors in criminal judgments but is narrowly reserved for only "fundamental miscarriage[s] of justice." Id. at 315, 115 S. Ct. at 861. To overcome procedural default through a showing of actual innocence, the petitioner must present

23

"reliable evidence . . . not presented at trial" such that "it is more likely than not that no reasonable juror would have convicted him of the underlying offense." Johnson, 256 F.3d at 1171 (quoting Schlup, 513 U.S. at 324, 327, 115 S. Ct. at 865, 867 (internal quotation mark omitted)).  This type of actual innocence claim is not Rozzelle's claim either.

In the third situation, a habeas petitioner claims his actual innocence should serve as a gateway to consideration of constitutional claims time-barred under AEDPA's one-year limitation period.  See 28 U.S.C. § 2244(d); Johnson, 513 F.3d at 1333–34; Arthur, 452 F.3d at 1244–46.  This is Rozzelle's type of claim.  Because the standards for actual innocence in cases of procedural default and untimely federal habeas petitions derive from the Supreme Court's decision in Schlup, we have at times conflated these two case types.  See Arthur, 452 F.3d at 1245 (applying the concept of the actual innocence exception to "procedural bar" to the Arthur case involving an AEDPA-time-barred § 2254 petition).  Therefore, like the actual innocence exception for procedural default, the alleged exception for AEDPA untimeliness would require the petitioner (1) to present "new reliable evidence . . . that was not presented at trial," Arthur, 452 F.3d at 1245 (quoting Schlup, 513 U.S. at 324, 115 S. Ct. at 865), and (2) to show "that it is more likely

24

than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt" in light of the new evidence. Johnson, 513 F.3d at 1334 (quoting Schlup, 513 U.S. at 327, 115 S. Ct. at 867); see also House v. Bell, 547 U.S. 518, 538, 126 S. Ct. 2064, 2077 (2006).

Further, as noted above, an AEDPA-time-barred petitioner must make a threshold showing of actual innocence before we will tackle whether the Suspension Clause requires an actual innocence exception to AEDPA's one-year filing window. Arthur, 452 F.3d at 1244. This Court has never decided that constitutional question because no petitioner has yet demonstrated his actual innocence. Johnson, 513 F.3d at 1333; see House, 547 U.S. at 538, 126 S. Ct. at 2077 ("[T]he Schlup standard is demanding and permits review only in the extraordinary case." (internal quotation marks omitted)).[14] Our decisions,

_____

[14] One circuit court has concluded that the Suspension Clause requires no such exception. See David v. Hall, 318 F.3d 343, 347 (1st Cir. 2003) (explaining that AEDPA's one-year statute of limitations "is not even arguably unconstitutional" as applied to petitioner who "had ample time . . . in which to bring his claim within the statutory deadline"). Three circuit courts have held that an actual innocence claim provides a basis for equitable tolling of AEDPA's one-year limitation period and entitles a petitioner to consideration of time-barred constitutional claims. See Lee v. Lampert, 653 F.3d 929, 932 (9th Cir. 2011) (en banc); Lopez v. Trani, 628 F.3d 1228, 1230–31 (10th Cir. 2010); Souter v. Jones, 395 F.3d 577, 602 (6th Cir. 2005).

This Court has generally framed the AEDPA-actual-innocence question not as an equitable tolling issue, which has a due diligence component, but as whether the Suspension Clause necessitates a constitutional exception to AEDPA's one-year time-bar where a habeas petitioner has shown actual innocence. Johnson, 513 F.3d at 1333; Arthur, 452 F.3d at 1244. But cf. Melson v. Allen, 548 F.3d 993, 1004 (11th Cir. 2008) (explaining that § 2254 petitioner

25

however, show that if such an exception exists, it exists only for actually innocent petitioners.

Likewise, we do not reach the Suspension Clause question because (1) Rozzelle fails to state a cognizable "actual innocence" claim, and (2) alternatively, Rozzelle has not made a sufficient evidentiary showing of actual innocence. We explain why.

## B. Cognizable "Actual Innocence" Claims

For starters, Petitioner Rozzelle's "actual innocence" claim is not the usual kind. Rozzelle does not claim that he is actually innocent of all crimes related to Greg Leier's beating and death. See Sawyer v. Whitley, 505 U.S. 333, 340, 112 S. Ct. 2514, 2519 (1992) ("A prototypical example of 'actual innocence' in a colloquial sense is the case where the State has convicted the wrong person of the crime."). Rozzelle does not even claim that he is actually innocent of a crime of homicide. Rather, Rozzelle primarily claims that he is actually innocent of second-degree murder and guilty of only manslaughter because "new" evidence

---

"failed to show that the AEDPA's one-year statute of limitations should be equitably tolled based on . . . his claims of actual innocence") vacated on other grounds, 130 S. Ct. 3491 (2010). In this regard, although Rozzelle cites San Martin v. McNeil, 633 F.3d 1257 (11th Cir. 2011), the basis of the equitable tolling claim in San Martin was not the petitioner's actual innocence, but his alleged lack of notice as to the date that the Supreme Court denied his petition for a writ of certiorari on direct appeal of his convictions and sentence. Id. at 1268.

26

shows he lacked a "depraved mind" and killed Leier only in the heat of passion.

Rozzelle argues that this latter type of mens rea, allegedly shown by his "new"

evidence, is legally sufficient to support only a conviction for manslaughter, a

lesser included offense of murder in Florida.  See Febre v. State, 30 So. 2d 367,

369 (Fla. 1947).[15]

Neither the Supreme Court nor this Court has squarely considered, or held,

whether a claim of this nature can satisfy Schlup's "actual innocence"

requirement. But in dicta, we have strongly suggested it cannot.  For example,

following Supreme Court pronouncements, we have stated that "'[a]ctual

innocence' means factual innocence, not mere legal insufficiency."  Johnson, 513

F.3d at 1334 (quoting Bousley v. United States, 523 U.S. 614, 623, 118 S. Ct.

1604, 1611 (1998)); see also Gonzalez v. Sec'y for Dep't of Corr., 366 F.3d 1253,

1274 (11th Cir. 2004) (en banc) ("Actual factual innocence is required; legal

innocence is not enough."); Johnson, 256 F.3d at 1171 ("This exception is

---

[15] We recognize that Rozzelle alternatively argues, passim, that he is not guilty of homicide at all because Leier's death was not caused by Rozzelle's admitted beating of Leier, but was caused by another person inflicting the fatal blow or by an intervening event, such as Leier's falling down the motel stairs due to intoxication.  There is so little, if any, "new reliable" support for either defense theory in the supplemented record that we summarily reject this claim without discussion.  In addition, we note that Rozzelle does not appear to claim that his homicide was "excusable" and wholly lawful under Florida Statutes § 782.03; to the extent Rozzelle does, we summarily reject that claim too for lack of "new reliable" evidence.

exceedingly narrow in scope, as it concerns a petitioner's 'actual' innocence rather than his 'legal' innocence.").[16]

Notably, we recently reaffirmed this important factual/legal distinction, albeit in the context of a federal prisoner's claim of actual innocence of his sentence. See McKay v. United States, 657 F.3d 1190 (11th Cir. 2011). Specifically, in McKay, a § 2255 petitioner claimed that he was actually innocent of his career-offender sentence because his prior conviction for carrying a concealed weapon should not have been classified as a predicate "crime of violence" under the sentencing guidelines. Id. at 1199. McKay had procedurally defaulted this claim in federal court by failing to object at sentencing and on direct appeal. Id. at 1193. In McKay, we did not reach the issue of "whether the actual innocence exception extends to the noncapital sentencing context." Id. at 1198. Rather, "[e]ven assuming that this exception does extend beyond the capital

---

[16] In Johnson v. Alabama, petitioner Johnson participated in a two-man home invasion and was convicted of capital murder of an occupant of the home. 256 F.3d at 1165–66. In his procedurally defaulted § 2254 petition, Johnson did not present any new evidence. Id. at 1172. He claimed only that "there was insufficient evidence [at trial] of his specific intent to kill" and therefore, he was innocent of capital murder and guilty of only felony murder, a lesser included offense. See id. at 1169, 1181–82. This Court affirmed the district court's dismissal of Johnson's § 2254 petition because Johnson "base[d] his objection on a new theory of defense, not newly-discovered evidence." Id. at 1172. Unlike Johnson, Rozzelle bases his petition on purportedly "new" evidence. Accordingly, here we must consider whether a new theory of defense based on new reliable evidence is a cognizable actual innocence claim.

28

sentencing context," we explained that "it still does not apply to McKay because his claim is one of legal, rather than factual, innocence and thus fails to fall within the actual innocence exception's purview."[17] Id. (emphasis added).

Similarly, other circuit courts of appeals have endorsed the view that actual innocence must be "factual" and not mere "legal" innocence. See Jaramillo v. Stewart, 340 F.3d 877, 882 (9th Cir. 2003); Ellis v. Hargett, 302 F.3d 1182, 1186 n.1 (10th Cir. 2002); Finley v. Johnson, 243 F.3d 215, 221 (5th Cir. 2001); Britz v. Cowan, 192 F.3d 1101, 1103 (7th Cir. 1999); Jones v. Delo, 56 F.3d 878, 883 (8th Cir. 1995). While all of these cases involve procedural default and not AEDPA's statute of limitations, their discussion of what constitutes factual versus legal innocence is informative, especially since the circuits diverge to some extent.

For example, circuit courts differ on whether a complete affirmative defense to a crime—such as insanity or self-defense—shows factual or only legal innocence. The Tenth Circuit, in Ellis v. Hargett, held that the requirement of "factual" versus "legal" innocence renders claims of actual innocence based on affirmative defenses insufficient under Schlup. 302 F.3d at 1186 n.1. In Ellis,

---

[17] McKay acknowledged that "a movant's procedural default is excused if he can show that he is actually innocent either of the crime of conviction or, in the capital sentencing context, of the sentence itself." 657 F.3d at 1196.

29

petitioner Ellis claimed that he was actually innocent of first-degree murder and shooting with intent to kill because new evidence showed he acted in self-defense or heat of passion. Id. at 1185–86. The Tenth Circuit rejected Ellis's actual innocence claim, explaining that Ellis did not claim that he was "factually innocent of shooting" the victim but "that he is legally innocent because his conduct is justified or mitigated by the doctrines of self-defense or heat of passion." Id. at 1186 n.1; see Beavers v. Saffle, 216 F.3d 918, 923 (10th Cir. 2000) ("The exception is intended for those rare situations where the State has convicted the wrong person of the crime . . . ." (internal quotation marks omitted)).

In Finley v. Johnson, the Fifth Circuit concluded that a showing of facts establishing an affirmative defense that would result in the defendant's acquittal constituted a sufficient showing of actual innocence to allow a petitioner to proceed with a procedurally defaulted constitutional claim. 243 F.3d at 221. Petitioner Finley claimed that new undisputed evidence showed he was actually innocent of the Texas crime of aggravated kidnapping because he believed his acts were "immediately necessary to avoid imminent harm" to the victim's wife and daughter. Id. at 220. Necessity is a complete defense to criminal conduct in Texas. Tex. Penal Code Ann. § 9.22; see Finley, 243 F.3d at 220 n.6. The Fifth

30

Circuit observed that "Finley has pointed to new evidence which is both undisputed and highly probative of his affirmative defense of necessity." Id. at 221. Noting that an actual innocence claim is "a factual matter," id. at 220, the Fifth Circuit concluded that "a showing of facts which are highly probative of an affirmative defense which if accepted by a jury would result in the defendant's acquittal constitutes a sufficient showing of 'actual innocence . . . .'" Id. at 221 (emphasis added).

The Ninth Circuit's Jaramillo v. Stewart also involved a complete affirmative defense to criminal conduct. In his procedurally barred § 2254 petition, Jaramillo claimed he was actually innocent of the Arizona crime of first-degree murder because new evidence showed he acted in self-defense, which rendered his conduct noncriminal. 340 F.3d at 879, 883. The Ninth Circuit explained that "'actual innocence' means factual innocence, not mere legal insufficiency," id. at 882 (quoting Bousley, 523 U.S. at 623, 118 S. Ct. at 1611), but concluded that petitioner Jaramillo's claim of justification pursuant to self-defense "corresponds with Schlup's actual innocence requirement," id. at 883. "Under Arizona law in effect at the time of the offense charged, justification was an affirmative defense rendering [Jaramillo's] conduct noncriminal." Id.

31

Likewise, the Seventh Circuit has held that a complete defense of insanity renders a petitioner "factually" rather than "legally" innocent of capital murder. In Britz v. Cowan, the Seventh Circuit rejected the State of Illinois's argument that "actual innocence" requires a defaulted habeas petitioner to show that he "didn't kill his victim." 192 F.3d at 1103. Accordingly, petitioner Britz's claim that he was insane at the time of the murder, for which he was convicted and sentenced to death, was a cognizable actual innocence claim under Schlup. However, the Seventh Circuit ultimately held that "Britz's chances of proving insanity, even if the experts had been allowed to testify, were vanishingly small, and so the 'actual innocence' defense to waiver fails." Id. (citation omitted).

In another capital case, the Eighth Circuit went farther and held that a defaulted petitioner's claim of innocence is "actual" and not "legal" when the claim negates an essential element of a capital conviction. See Jones, 56 F.3d at 883. In Jones v. Delo, petitioner Jones, who was convicted of capital murder, submitted new evidence showing that, at the time he killed his girlfriend, he was incapable of "deliberation," an element of capital murder. Id. at 882. With new evidence of Jones's mental aptitude and organic brain disease, medical experts testified that Jones was "incapable of deliberation at the time of the killing." Id.

32

Given Jones's "alleged incapacity to form the predicate deliberative intent," the Eighth Circuit rejected Missouri's argument that an inability to deliberate is a claim of legal innocence and explained that "one is . . . actually innocent if the State has the 'right' person but he is not guilty of the crime with which he is charged." Id. at 883.  Accordingly, if Jones could negate his ability to deliberate, "an essential element of the crime for which he was convicted," then his claim would not be "one of mere legal innocence." Id.  Ultimately, the Eighth Circuit concluded that Jones had made an insufficient evidentiary showing to bypass his procedural default or even to obtain a remand for an evidentiary hearing.[18] Id. at 883–84.

Today, we need not decide whether Schlup permits a claim of actual innocence based on "new reliable" evidence of a complete affirmative defense that renders the conduct of conviction wholly noncriminal and requires acquittal.  See Jaramillo, 340 F.3d at 883; Finley, 243 F.3d at 221; Britz, 192 F.3d at 1103.  Nor need we address essential elements of capital crimes.  Rather, we decide only that

---

[18] In Jones, the petitioner did not make a sufficient evidentiary showing of lack of capacity to deliberate, and there was no discussion of whether the negation of "deliberation" under Missouri law would render the petitioner not guilty of all homicide crimes or just capital murder.

33

the narrow and extraordinary nature of Schlup's actual innocence "gateway" does not extend to petitioners, like Rozzelle, who did the killing and whose alleged "actual innocence" of a non-capital homicide conviction is premised on being guilty of only a lesser degree of homicide. For several reasons, we conclude that, in these circumstances, Petitioner Rozzelle fails to state a cognizable actual innocence claim under Schlup.

First, the Supreme Court and this Court repeatedly have emphasized that circumstances meriting the consideration of procedurally defaulted or barred constitutional claims are "extremely rare" and apply only in the "extraordinary case." Schlup, 513 U.S. at 324, 115 S. Ct. at 865 ("[A] substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare."); see House, 547 U.S. at 538, 126 S. Ct. at 2077; Johnson, 256 F.3d at 1171 (characterizing the actual innocence exception as "exceedingly narrow in scope"). Indeed, the "very reason the miscarriage of justice exception was linked to a movant's actual innocence was to ensure" that the exception would remain "narrow," McKay, 657 F.3d at 1198, and apply only where "the individual interest in justice" outweighs "the societal interests in finality, comity [for state court judgments], and conservation of scarce judicial resources," Schlup, 513 U.S.

34

at 324, 115 S. Ct. at 865. As we explained in McKay, the Supreme Court has cautioned the lower courts to "exercise restraint when determining whether to expand the exceptions to the procedural default rule." McKay, 657 F.3d at 1198; see Dretke v. Haley, 541 U.S. 386, 395, 124 S. Ct. 1847, 1853 (2004) (explaining that expanding exceptions to procedural default rule "would have the unhappy effect of prolonging the pendency of federal habeas applications as each new exception is tested in the courts of appeals").

Allowing claims of actual innocence to be brought whenever a habeas petitioner argues that he was convicted of an erroneous degree of crime, as in this case, would substantially expand the scope of the actual innocence exception. Almost all crimes with degrees could face similar challenges. Run-of-the-mill offense degree determinations are better assessed in the first instance by trial courts, juries and state appellate courts. Opening federal habeas review to petitions involving degrees of non-capital state crimes could "so broaden the inquiry as to make it anything but a 'narrow' exception to the principle of finality that [the Supreme Court] ha[s] previously described it to be." Sawyer, 505 U.S. at 345, 112 S. Ct at 2522. Importantly, broadening this inquiry further affects the federal-state balance and the very nature of habeas review, as it broadens the

35

question from whether the petitioner is completely innocent to whether the jury convicted the petitioner of the accurate degree of state crime, a significantly more intrusive manner of review. Cf. Calderon v. Thompson, 523 U.S. 538, 555, 118 S. Ct. 1489, 1501 (1998) ("Finality serves as well to preserve the federal balance.").[19]

Second, the Supreme Court's categorical language in actual innocence cases does not suggest that it is narrowly slicing the various degrees of wrongdoing. See Schlup, 513 U.S. at 324, 115 S. Ct. at 865 ("[E]xperience has taught us that a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare."); cf. Murray v. Carrier, 477 U.S. 478, 496, 106 S. Ct. 2639, 2649 (1986) ("[W]e think that in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default."). In Rozzelle's core cases on "actual innocence," Schlup and House, both petitioners disclaimed any involvement with the crime. See House, 547 U.S. at 554, 126 S. Ct. at 2086 ("Yet the central forensic proof connecting [the petitioner] to the crime—the blood and

---

[19] This Court's repeated reluctance to reach the question of whether the Suspension Clause requires an exception to AEDPA's one-year statute of limitations for actually innocent petitioners also evinces our restraint in this regard. See Johnson, 513 F.3d at 1333.

36

the semen—has been called into question, and [the petitioner] has put forward substantial evidence pointing to a different suspect.");[20] Schlup, 513 U.S. at 331, 115 S. Ct. at 869 ("Schlup's evidence includes the sworn statements of several eyewitnesses that Schlup was not involved in the crime.").

Third, the nature of Schlup's evidentiary inquiry also supports this conclusion. As the Supreme Court explained in Schlup and House, overcoming the bar to defaulted constitutional claims requires a showing of "new reliable evidence . . . not presented at trial." House, 547 U.S. at 537, 126 S. Ct. at 2077 (quoting Schlup, 513 U.S. at 324, 115 S. Ct. at 865). This "new" evidence must do more than counterbalance the evidence that sustained the petitioner's conviction. See Sibley, 377 F.3d at 1207 (concluding that even if new evidence showed that the murder victim was the aggressor, "a reasonable juror could still quite possibly have concluded that [petitioner] acted with murderous intent, rather than out of self-defense"). The new evidence must be so significant and reliable that, considered with the trial record as a whole, it "undermine[s] confidence in the result of the trial" such that "it is more likely than not that no reasonable juror

---

[20] House involved new DNA evidence showing that semen in the raped victim's nightgown came from her husband, not from the petitioner-defendant House, as well as other new testimony and blood evidence. 547 U.S. at 540–47, 126 S. Ct. at 2078–83.

would have found petitioner guilty beyond a reasonable doubt." House, 547 U.S. at 537, 126 S. Ct. at 2077 (internal quotation marks omitted). Evidence that would at best substitute one criminal homicide conviction for another homicide conviction is ordinarily not of this caliber.

"Actual innocence," whatever its outer boundaries, does not discern "extremely rare," "extraordinary" "miscarriages of justice" in shades of gray. Schlup, 513 U.S. at 321, 115 S. Ct. at 864. Rozzelle's individual interest in reducing his second-degree murder conviction to a lesser included homicide conviction does not make AEDPA unconstitutional nor does it outweigh the "societal interests in finality, comity, and conservation of scarce judicial resources" that AEDPA's one-year limitation period protects. Id. at 324, 115 S. Ct. at 865 ("[T]he fundamental miscarriage of justice exception seeks to balance the societal interests in finality, comity, and conservation of scarce judicial resources with the individual interest in justice that arises in the extraordinary case."); Day v. Crosby, 391 F.3d 1192, 1194 (11th Cir. 2004) (per curiam) (affirming dismissal of § 2254 petition as untimely and stating that Congress enacted AEDPA to "promote comity, finality, and federalism, and Congress enacted the AEDPA statute of limitations as the principal tool to serve the well-

38

recognized interest in the finality of state court judgments." (internal quotation marks and alteration omitted)).

## C. Rozzelle's Evidence Is Insufficient to Show Actual Innocence

Even if Petitioner Rozzelle's claim of actual innocence were cognizable, his claim still fails because his "new" evidence is largely cumulative of what the jury heard, and he has not made a sufficient showing that it is more likely than not that no reasonable juror would have convicted him of second-degree murder.

To support a claim of actual innocence, a time-barred § 2254 petitioner must present "new reliable evidence" such that it is more likely than not that "no reasonable juror would have convicted him in light of the new evidence." Schlup, 513 U.S. at 324, 327, 115 S. Ct. at 865, 867 (citing "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence" as examples of "new reliable evidence"). "[T]he habeas court's analysis is not limited to such evidence." House, 547 U.S. at 537, 126 S. Ct. at 2077. Rather, "the habeas court must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." Id. at 538, 126 S.Ct. at 2077 (internal quotation marks omitted). In addition, we "may consider how the timing

of the [evidentiary] submission and the likely credibility of the affiants bear on the probable reliability of that evidence." Melson v. Allen, 548 F.3d 993, 1002 (11th Cir. 2008) (quoting House, 547 U.S. at 537, 126 S. Ct. at 2077), vacated on other grounds, 130 S. Ct. 3491 (2010).

As we noted above, Petitioner Rozzelle's "new" evidence consists of statements in police reports and records purportedly showing that he killed Greg Leier with a short series of punches only after catching him twice with Barnes in intimate encounters. The evidence Rozzelle presents consists of (1) Leier's statement to Officer Burritt that he "got caught with a woman"; (2) Andrea Barnes's statement to Officer Williams that Rozzelle "caught" her with Leier and her statement to Detective Matz that after returning from visiting his brother Rozzelle "became crazy"; (3) Rozzelle's testimony, from his Florida 3.850 hearing, stating that he would not have beaten Leier had Leier not "been caught twice in sexual encounters" with Barnes; (4) witness Adley Boudreaux's written statement that, after seeing Rozzelle enter the motel room and hearing a female yelling "stop, stop, leave him alone," he saw Rozzelle enter the motel office, which Rozzelle argues shows any beating was not extended and occurred before Rozzelle went to the motel office; (5) motel employee Wesley Rosnick's written

40

statement that Rozzelle asked for an extra key to his own room around the same time motel employee Harish Chauhan reported that Leier was bleeding; (6) Rozzelle and Leier's statements to police that Rozzelle used only his hands or fists to beat Leier; (7) Barnes's medical records, which do not indicate that Rozzelle knocked out any of Barnes's teeth; and (8) a police report addendum documenting Barnes's injuries, which also does not indicate that Rozzelle knocked out any of Barnes's teeth.[21]

The jury, which convicted Petitioner Rozzelle of second-degree murder, heard the substance of virtually all of this evidence. Both Petitioner Rozzelle's own statements to police and his brother Anthony's trial testimony showed that Rozzelle beat Leier after discovering Leier and Barnes in an intimate encounter.

---

[21] Because Rozzelle's "new" evidence fails in any event, we need not reach the issue of whether Rozzelle's evidence that was available at trial but was simply not presented should be considered "new" under Schlup. Compare Goldblum v. Klem, 510 F.3d 204, 226 n.14 (3d Cir. 2007) ("Evidence is not 'new' if it was available at trial, but a petitioner merely chose not to present it to the jury." (internal quotation marks omitted)), and Amrine v. Bowersox, 128 F.3d 1222, 1230 (8th Cir. 1997) ("The evidence is new only if it was not available at trial and could not have been discovered earlier through the exercise of due diligence."), with Houck v. Stickman, 625 F.3d 88, 94 (3d Cir. 2010) ("[E]vidence . . . not discovered for use at trial because trial counsel was ineffective . . . may be regarded as new provided that it is the very evidence that the petitioner claims demonstrates his innocence."), and Gomez v. Jaimet, 350 F.3d 673, 679–80 (7th Cir. 2003) ("Particularly in a case where the underlying constitutional violation claimed is the ineffective assistance of counsel premised on a failure to present evidence, a requirement that new evidence be unknown to the defense at the time of trial would operate as a roadblock to the actual innocence gateway. Here, the very premise of the ineffectiveness claim is that the trial counsel knew of yet failed to present evidence that Gomez is alleging proves his innocence.").

41

Anthony testified that Rozzelle had "caught" Barnes with Leier after returning to the motel the first time, "cold-cocked" both of them and "[k]nocked them out." The jury heard Officer Burritt's testimony that Rozzelle stated, two or three times, "I caught that guy fucking my old lady and I beat the hell out of him. I'm from the old school and he had it coming." The jury heard Petitioner Rozzelle's taped statement, in which he said, "I love this woman," and he "whupped [Leier's] ass" after seeing Leier and Barnes together upon returning from the bar the second time. Thus, Rozzelle's so-called "new" evidence—Leier's statement that he "got caught with a woman," Barnes's statements to police that Rozzelle "caught" her with Leier and "became crazy," and Rozzelle's post-conviction testimony—adds nothing to the accounts the jury already heard at trial.

The jury also heard the substance of Boudreaux's and Rosnick's written statements, which indicate that the beating necessarily occurred before Rozzelle went to the motel office for another room key. At trial, Boudreaux himself testified that he saw Rozzelle beat on the door, saw Rozzelle enter, heard a female yelling "stop, stop . . . [l]eave him alone," and subsequently saw Rozzelle enter the

42

motel office.[22]   Petitioner Rozzelle's own statements to police, admitted at trial, and Chauhan's trial testimony indicate any beating was over before Rozzelle went to the motel office.  Petitioner Rozzelle told police that the police arrived "pretty quick," "probably two or three minutes after" he went to the motel office to get another room key (after Barnes locked herself in the room).  Chauhan testified that only minutes after Leier phoned the front desk asking for security, which was around the same time Rozzelle was in the office getting another room key, Chauhan saw Leier, his face covered with blood, walking down the motel stairs.  Whatever happened that night, the jury heard trial evidence that the beating was before Rozzelle went to the motel office.

The jury also heard ample testimony that Petitioner Rozzelle beat Leier using only his fists.  In Rozzelle's taped statement, played for the jury, Rozzelle affirmed in response to police questioning that he did not use any weapons to beat Leier and did not pick up any objects and hit Leier with them.  Rozzelle stated that he struck Leier only with "[a] couple of good left hooks" and "[a] couple of right

---

[22] We recognize that Boudreaux also testified, however, that he was not sure in which order it happened because too much time had passed and admitted Rozzelle's entering the motel office may have been prior to his getting into the room or after.  Nonetheless, Boudreaux did say the entering and yelling was before Rozzelle went to the motel office.

crosses, too." EMT Brian Hughes, who treated Leier at the motel, testified at trial that before Leier lost consciousness, he stated that he was hit with a fist. Hughes testified that he asked Leier if he was hit with any other objects, and Leier said no. Dr. Michael Berkland testified that Leier's injuries were consistent with a beating from a man's fists, and Dr. Carl Glidden testified that Leier's injuries "could be consistent" with a beating from a person's fists. Rozzelle's and Leier's additional statements that Rozzelle beat Leier using only his fists are cumulative of this trial evidence.

Barnes's medical records and a police report addendum do show that Rozzelle did not knock out Barnes's upper teeth, contrary to Officer Williams's trial testimony. However, a photo of Barnes introduced at trial to prove her injuries clearly shows her upper teeth, which already contradicts Officer Williams's testimony.

In any event, these "new" additions, considered with "all the evidence, old and new," House, 547 U.S. at 538, 126 S. Ct. at 2077 (internal quotation marks omitted), do not demonstrate that "it is more likely than not that no reasonable juror would have found [the] petitioner guilty beyond a reasonable doubt" of second-degree murder, id. at 537, 126 S. Ct. at 2077. On the contrary, Rozzelle's

44

"new" evidence lends further support to the jury's finding that Rozzelle acted with a "depraved mind."

As we noted above, a conviction for second-degree murder in Florida requires that the defendant kill "by any act imminently dangerous to another and evincing a depraved mind regardless of human life, although without any premeditated design." Fla. Stat. § 782.04(2). The Florida Supreme Court has defined an "act imminently dangerous to another and evincing a depraved mind" as "an act or series of acts that: (1) a person of ordinary judgment would know is reasonably certain to kill or do serious bodily injury to another, and (2) is done from ill will, hatred, spite or an evil intent, and (3) is of such a nature that the act itself indicates an indifference to human life." State v. Montgomery, 39 So. 3d 252, 255–56 (Fla. 2010) (quoting Bellamy v. State, 977 So. 2d 682, 683 (Fla. 2d DCA 2008)). "[I]ntent or state of mind is a jury question that, in most instances, cannot be ascertained by direct evidence . . . ." State v. Stenza, 453 So. 2d 169, 171 (Fla. 2d DCA 1984).

To the extent Barnes's injuries are even probative of Rozzelle's state of mind as to Leier's murder, Barnes's medical records only support the prosecution's case that Rozzelle killed Leier with "an evil intent" and with

"indifference to human life." Montgomery, 39 So. 3d at 256. Barnes's medical records document a litany of injuries Rozzelle inflicted on Barnes, including a fractured left clavicle, loose teeth, a split lip, and numerous bruises to her upper torso. Officer Williams's trial testimony might have been inaccurate about Barnes's teeth, but this "new" evidence Rozzelle introduces was more damaging than it was helpful to his heat of passion argument.

The balance of the evidence is no more favorable to Rozzelle's heat of passion claim. Petitioner Rozzelle's brother Anthony testified at trial that Rozzelle was "[n]ot excited" when he described catching Barnes and Leier together after returning to the bar from the motel. See Douglas v. State, 652 So. 2d 887, 890 (Fla. 4th DCA 1995) (explaining that a person who kills in the heat of passion is "intoxicated by his passion" and in a "condition of frenzy and distraction" (quoting Disney v. State, 73 So. 598, 601 (Fla. 1916))). More importantly, Petitioner Rozzelle's taped, post-arrest statement did not evoke the "blind and unreasoning fury" characteristic of a heat of passion killing. Id. (quoting Disney, 73 So. at 601). Rather, Rozzelle provided a calculated explanation for why he beat Leier. Rozzelle was not overcome by rage; he beat Leier because Rozzelle was "from the old school" and Leier "deserved an ass

46

whupping" and "had it coming."  After he was arrested and brought to the police station, Rozzelle told police that he would have beaten Leier even more badly had he "thought about it":

> You're lucky this [foot] wouldn't fit up his ass or it would have been there, too . . . . I don't feel sorry about it.  The only thing that I didn't do to that motherfucker is throw him off the balcony, and if I had probably thought about it, I would have done that, too.

Given that Rozzelle beat Leier not once but at two different times separated by several hours, and given Rozzelle's cavalier, mean-spirited and unapologetic attitude toward his brutal attack, the jury was entitled to conclude from the evidence that Rozzelle acted with a depraved mind and not in the heat of passion.

"New" evidence purportedly showing that Rozzelle's beating of Leier was not a "prolonged assault" also does not show that Rozzelle did not kill Leier with a "depraved mind."  Rozzelle argues that he lacked a "depraved mind" because Boudreaux's and Rosnick's unadmitted statements show his beating of Leier lasted "only seconds."  But these statements show no such thing.  In his written statement, Boudreaux indicated that Rozzelle entered the motel room and that Boudreaux heard a woman "yelling stop, stop, leave him alone" before he saw Rozzelle go to the motel office.  Rosnick's statement noted that "[a]t about the

47

time [Rozzelle] was leaving [the motel office] or a few seconds afterwards [Leier] called the office asking for security" and Chauhan observed Leier bleeding. Nothing Boudreaux or Rosnick stated indicates how long Rozzelle's second beating lasted.

Moreover, the allegedly brief duration of Rozzelle's second assault does not show that he lacked a "depraved mind" given the vicious and severe nature of the second assault. Leier's horrific injuries provide ample evidence of Rozzelle's depravity, the duration of the beating notwithstanding. See Beasley v. State, 774 So. 2d 649, 660–61 (Fla. 2000) (showing that severity of a murder victim's injuries is probative of killer's mens rea). Indeed, when Officer Burritt arrived at the motel, Leier had "blood pouring out of his mouth" and "was having difficulty breathing and talking." Burritt explained that Leier's head "almost looked twice the size of a normal human being" due to "massive swelling." Burritt had "never seen anybody beaten so badly in [his] life." Dr. Glidden testified that upon Leier's arrival at the hospital, Leier's brain "was more or less like jello at that time, no form or function to it." Dr. Witkind testified that Leier had massive bleeding in his brain and under his skull. Dr. Berkland testified that Leier's injuries included bruises around the eyes, face and mouth, and on the scalp, chest, both arms, and

48

deep bruises extending to the muscle tissue. The extreme trauma Rozzelle so rapidly inflicted on Leier is itself compelling evidence of Rozzelle's depraved mind.

In sum, the jury already heard evidence that Petitioner Rozzelle killed Leier only after discovering Leier and Barnes in sexual encounters. Yet Rozzelle's own statements, his brother's testimony, the extent of Leier's injuries and other trial evidence would more than entitle a jury to conclude that Leier's homicide was second-degree murder beyond a reasonable doubt. See Forehand v. State, 171 So. 241, 244 (Fla. 1936) (explaining that a fact pattern may support jury findings of either depraved mind or heat of passion). At a minimum, the evidence, old and "new" together, does not show that "it is more likely than not that no reasonable juror would have convicted" Rozzelle of second-degree murder. Johnson, 256 F.3d at 1171 (quoting Schlup, 513 U.S. at 327, 115 S. Ct. at 867).

## IV. CONCLUSION

For all of these reasons, we affirm the district court's denial of Rozzelle's time-barred §2254 petition.

**AFFIRMED.**

49