[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-10483

Non-Argument Calendar

_____

VICTOR JEROME BELL,

Petitioner-Appellant,

*versus*

ATTORNEY GENERAL, STATE OF FLORIDA,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 3:20-cv-05894-LC-EMT

_____

Before WILSON, JILL PRYOR, and LUCK, Circuit Judges.

PER CURIAM:

Victor Bell, a Florida prisoner, appeals the district court's denial of his 28 U.S.C. § 2254 petition for a writ of habeas corpus. After careful consideration of the parties' briefs and the record, we affirm.

**I.**

In 2012, Bell lived with his girlfriend, Lanette Ogletree. They shared their home with Michelle Caldwell, Ogletree's adult daughter, and Gary Johnson, Caldwell's boyfriend.

On the morning of April 15, 2012, Bell argued with Caldwell and Johnson. Although Bell, on the one hand, and Johnson and Caldwell, on the other, offer different accounts about what occurred during the argument, they agree that it ended with Bell hitting Johnson multiple times with a baseball bat and left Johnson with a serious brain injury.

After the fight, Bell was charged in Florida state court with several crimes: committing upon Johnson an aggravated battery (Count One), committing upon Caldwell an aggravated battery (Count Two), and resisting an officer without violence (Count Three). Bell pleaded not guilty and proceeded to trial.

In this section, we review the proceedings in Bell's criminal case. We then discuss his direct appeal, his post-conviction

proceedings in Florida state court, and his habeas proceedings in federal court.

## A.

At Bell's criminal trial, the State and Bell told competing stories about what happened during the fight on April 15. We review the testimony that each side introduced.

The State's primary witnesses were Johnson and Caldwell. They testified that the night before the fight Johnson threw a party at their house for Caldwell's birthday. After the party, Johnson left the house and stayed with his daughter.

The next morning, before Johnson returned, Bell complained to Caldwell that Johnson had eaten Bell's bacon. Bell and Caldwell got into a heated argument. According to Caldwell, during the fight, Bell stood over her, yelled at her, and pushed her in the chest. When Caldwell tried to call the police, Bell snatched her phone and threw it at a wall.

Johnson testified that he returned home in time to see Bell shove Caldwell. He tried to intervene to stop the fight. Bell shoved Johnson and started to argue with him. According to Johnson, Bell then grabbed an aluminum baseball bat and swung it at him. Bell missed, and the two men struggled for control of the bat. As they battled over the bat, they exited the house.

Outside the house, Bell gained controlled over the bat. Johnson tried to run away, but Bell chased him. Bell hit him in the back with the bat, and he fell to the ground. Bell hit Johnson again across

the head. Johnson heard Bell say, "I'm going to kill you, I'm going to kill you." Doc. 17-3 at 106.[1] Johnson then lost consciousness.

Caldwell provided a similar account of the fight. She testified that Bell initially grabbed the bat. She stated that once the men were outside, Bell threatened to kill Johnson, hit him across the back, and continued to strike him when he was on the ground. Caldwell testified that she begged Bell to stop, but Bell continued hitting Johnson even after he stopped moving. She estimated that Bell hit Johnson with the bat approximately 20 times. To stop Bell, Caldwell put herself over Johnson's body and put her arm up. Bell swung again and hit Caldwell, fracturing her wrist. After hitting Caldwell, Bell went inside the house. Caldwell then called 911.

Johnson was seriously injured and taken to the hospital. At the hospital, he remained in a coma for four days. He needed multiple surgeries to repair a skull fracture and had to relearn how to walk and talk.

When they testified, Johnson and Caldwell were asked repeatedly about how the attack occurred. Johnson testified that Bell was the one who brought out the bat and denied swinging the bat at him or provoking him. Caldwell provided similar testimony.

In addition to Johnson and Caldwell, the State called several other witnesses. Detective Lisa Alverson, a Pensacola police officer, testified about interviewing Bell at the police station after his arrest. She stated that Bell was upset during the interview and

---

[1] "Doc." numbers refer to the district court's docket entries.

frequently had to restart his story. Bell told her that during the argument, Johnson brought out the bat and struck him with it. Bell stated that he took the bat away from Johnson and then struck Johnson in the head with the bat. Alverson also testified that several days after the fight, she interviewed Johnson while he was in the hospital. But she did not mention what Johnson said during the interview.

The State also called Mary Jane Benson, a surgeon who treated Johnson, to testify. She said that a CT scan of Johnson's head and neck showed that he had sustained a skull fracture and bruising to his brain. According to Benson, the scan showed that Johnson's skull was broken into "a lot of pieces." *Id.* at 195. On cross examination, Benson admitted that lab work performed at the hospital showed that Johnson tested positive for cocaine.

The State's other witnesses included law enforcement officers who arrived after the fight. They testified that Bell initially refused to comply with their orders to come out of the house.

Bell called his own witnesses who testified that Johnson and Caldwell, not Bell, were the aggressors in the fight. Bell first called Ogletree, his girlfriend and Caldwell's mother. She described what occurred at Caldwell's birthday party the night before the fight. She testified that Johnson was drunk and argued with Caldwell. During the argument, Caldwell retrieved the baseball bat and was going to hit Johnson. But before Caldwell could hit him, he took the bat away and placed it outside.

Ogletree also testified about what occurred the next morning. The morning began with Caldwell and Bell arguing. But Ogletree denied that this altercation became physical or that Bell grabbed Caldwell's phone. She testified that when Johnson saw Caldwell and Bell arguing, he retrieved the bat. She also said that while the two men were inside the house, Johnson swung the bat and hit Bell on the shoulders, on the leg, and "upside the head." Doc. 17-4 at 24. While Johnson was swinging the bat inside the house, he hit Caldwell on the wrist.

According to Ogletree, as the two men struggled over the bat, they ended up outside the house. Bell tried to run away, but Johnson chased him and swung the bat at him. At the same time, Caldwell found a beer bottle and tried to attack Bell. Ogletree testified that Caldwell jumped on Bell's back and tried to hit him with the beer bottle. Around this time, Bell wrestled the bat away from Johnson, but Johnson continued to fight. Ogletree saw Bell hit Johnson three times with the bat: once on the side of the head and twice on the leg. She admitted that once Johnson hit the ground, he was no longer fighting back. Ogletree denied seeing Caldwell attempt to shield Johnson from Bell or hearing Bell threaten to kill Johnson.

Bell testified in his own defense. He admitted to arguing with Caldwell on the morning of April 15. After Caldwell got in his face and threatened him, he "pushed her back a little bit." *Id.* at 45. The two yelled and cursed at each other. According to Bell, Johnson watched him argue with Caldwell. Caldwell and Johnson then

left the house. But Johnson quickly came back inside, swinging the bat, and threatening to kill Bell. Bell testified that after the first swing missed him, Johnson swung the bat a second time and hit Caldwell on the arm.

When Johnson tried to swing for a third time, Bell grabbed the bat and dragged Johnson out of the house. The two men tussled over the bat. When Johnson gained control of it, he chased Bell, saying, "I'm going to kill you now for real." *Id.* at 48. Johnson swung the bat a few times and hit Bell on the shoulder. Caldwell came up with a beer bottle and entered the fray. The three struggled and fell to the ground.

Bell testified that he got hold of the bat and swung it to keep Johnson away. He admitted to hitting Johnson once on the head and a few times on the leg. He testified that after he hit Johnson on the head, he did not see any blood and that Johnson had only a "little knot" on his head. *Id.* at 61. After hitting Johnson the first time, Bell admitted that Johnson "didn't continue to come at" him. *Id.* at 66. Bell denied making any statement threatening to kill Johnson and said that he hit Johnson on the head accidentally.

During its closing, the State argued that it had proven beyond a reasonable doubt that Bell committed upon Johnson an aggravated battery.[2] Even if the jury believed Bell's testimony about

---

[2] In closing arguments, the parties also addressed whether the State had proven beyond a reasonable doubt that Bell had committed upon Caldwell an aggravated battery, Count Two of the indictment, and had resisted an officer

the fight, the State said, there was sufficient evidence to convict because Bell admitted that once he had the bat Johnson no longer posed a threat. Alternatively, even if it was necessary for Bell to hit Johnson one time to protect himself, the State argued that it was unnecessary for Bell to hit Johnson a second or third time.

In his closing argument, Bell urged the jury to acquit him. He argued that he was justified in using deadly force to defend himself because Johnson had attacked him with a bat.

In its jury instructions, the court reviewed the elements of aggravated battery under Florida law. It also instructed the jury about self-defense. It explained that there was a defense to the charged crime if Johnson's injury "resulted from the justifiable use of deadly force." *Id.* at 109. The court stated that the use of deadly force was justified if Bell "reasonably believe[d] that the force [was] necessary to prevent imminent death or great bodily harm to himself while resisting any attempt to commit aggravated battery upon him." *Id.* The court cautioned that "to justify the use of deadly force, the appearance of danger must have been so real that a reasonably cautious and prudent person under the same circumstances would have believed that the danger [could] be avoided only through the use of that force." *Id.* at 110. It also instructed that if Bell "was not engaged in an unlawful activity and was attacked in [any place] where he had a right to be, he had no duty to retreat

---

without violence, Count Three. Because those counts are not at issue in this appeal, we do not review the parties' closing arguments or the district court's instructions as to them.

and had the right to stand his ground and meet force with force including deadly force if he reasonably believed that it was necessary to do so to prevent death or great bodily harm to himself." *Id.* at 110–11. If the jury was left with "reasonable doubt on the question of whether [Bell] was justified in the use of deadly force," it "should find [him] not guilty." *Id.* at 111.

The jury found Bell guilty of Count One—committing upon Johnson an aggravated battery—and Count Three—resisting an officer without violence. But it found him not guilty of Count Two—committing upon Caldwell an aggravated battery. The court ultimately sentenced Bell to 18 years on Count One and 364 days on Count Three with the sentences to run concurrently.

**B.**

Bell appealed his conviction, arguing that the trial court should have continued the trial, allowed him to present evidence about Johnson's demeanor at Caldwell's birthday party, and excluded photographs of Johnson's injuries. Florida's First District Court of Appeal affirmed without a written opinion. *See Bell v. State*, 147 So. 3d 981 (Fla. Dist. Ct. App. 2014) (unpublished).

**C.**

Bell, proceeding *pro se*, filed a Florida Rule of Criminal Procedure 3.850 motion in state circuit court seeking post-conviction relief. He raised several claims including that (1) he was entitled to a new trial because of newly discovered eyewitness testimony; (2) the State had failed to fulfill its disclosure obligations under

*Brady v. Maryland*, 373 U.S. 83 (1963); and (3) he had received ineffective assistance of appellate counsel.

The newly discovered testimony was from Gail Jerome Brand, a neighbor who witnessed the fight. In a written statement, Brand said that Johnson initially retrieved the bat and that Caldwell repeatedly punched and hit Bell with a bottle. Brand reported that once Bell had control of the bat, he swung it only one time to defend himself from Johnson and Caldwell. Brand's signed statement was dated approximately six months after the criminal trial. Although the statement was signed and notarized, it was not sworn under penalty of perjury.

Bell's *Brady* claim asserted that the State failed to turn over a report from Alverson with statements Johnson made during the hospital interview. The report noted that he told Alverson that after seeing Bell hit Caldwell, he retrieved the bat and threatened Bell. He admitted to swinging the bat at Bell one time inside the home but said that he did not make contact. He explained that once the two men were outside, Bell took control of the bat. According to Johnson, he tried to run away, but Bell caught him and struck him in the back of the head with the bat.

The state circuit court denied the Rule 3.850 motion. It explained that under Florida law, to state a claim for a new trial based on newly discovered evidence, a movant had to include a statement from the witness who was providing the new evidence, and the statement had to be sworn under the penalty of perjury. To prevail on the claim, the movant also had to show a reasonable

probability that the new evidence would have resulted in an acquittal or a lesser sentence. The court concluded that Brand's statement did not satisfy the sworn statement requirement. The court alternatively ruled that even if Brand's statement had been sworn, there was "no reasonable probability" that it would have resulted in an acquittal or a lesser sentence because the statement was "not consistent with defense testimony that [Bell] struck Johnson three times and fail[ed] to refute evidence [that] Johnson was no longer a threat or was trying to get away once [Bell] had the bat." Doc. 17-5 at 64–65.

The court also rejected the *Brady* claim. It determined that there was "no reasonable probability the jury would have reached a different verdict" if Johnson's statements from the hospital interview had been disclosed. *Id.* at 66–67. The court acknowledged that Bell could have used the statements to impeach Johnson's testimony that Bell was the first to grab the bat. But the court nevertheless concluded that the statements were not material. Even with the statements, Bell could not establish that he acted in self-defense because his own testimony showed that he continued to hit Johnson after Johnson was no longer threatening him.

In addition, the state court addressed Bell's claim that appellate counsel was ineffective. It rejected the claim as "not properly raised in a rule 3.850 motion." *Id.* at 65.

Bell appealed the denial of his Rule 3.850 motion. The First District Court of Appeal affirmed without written opinion. *See Bell v. State*, 202 So. 3d 407 (Fla. Dist. Ct. App. 2016) (unpublished).

After his Rule 3.850 motion was denied, Bell continued to file *pro se* pleadings in Florida state courts challenging his conviction and sentence. Among other submissions, in 2016 Bell filed a petition for a writ of habeas corpus in the First District Court of Appeal, pursuant to Florida Rule of Appellate Procedure 9.141(d), alleging ineffective assistance of appellate counsel. Although Bell asserted that appellate counsel was ineffective for several reasons, he raised no claim based on appellate counsel's failure to move to reopen the case in the trial court after learning of the State's failure to disclose Alverson's report with Johnson's statements. The appellate court denied the petition in a summary order. *See Bell v. State*, 228 So. 3d 552 (Fla. Dist. Ct. App. 2017) (unpublished).[3]

## D.

Bell, proceeding *pro se*, filed a federal habeas petition pursuant to 28 U.S.C. § 2254. In the petition, he raised several claims relevant to this appeal:

- a *Brady* claim based on the State's failure to turn over Alverson's report containing the statements Johnson made during the hospital interview (Grounds One and Nine);

- a due process claim based on the trial court's failure to instruct the jury properly on the justifiable use of force under

---

[3] After Bell filed multiple appeals related to the judgment in his criminal case, the First District Court of Appeal entered an order barring him from submitting future *pro se* filings to that court concerning the criminal judgment. *See Bell v. State*, 241 So. 3d 983 (Fla. Dist. Ct. App. 2018).

Florida's "stand your ground" law, Fla. Stat. § 776.032 (Ground Two);

- an ineffective assistance of counsel claim based on trial counsel's waiver of Bell's right to attend a witness's pretrial deposition (Ground Three);

- an ineffective assistance of counsel claim based on appellate counsel's failure to file a motion to reopen the criminal case after the disclosure of Alverson's report containing the statements Johnson made during the hospital interview (Ground Five);

- a due process claim based on the prosecution's having struck all the Black members of the jury pool (Ground Seven); and

- a due process claim based on inflammatory remarks the prosecutor made in closing argument (Grounds Ten and Eleven).

A magistrate judge issued a report recommending that the petition be denied. As to the *Brady* claim raised in Grounds One and Nine,[4] the magistrate judge concluded that Bell was not entitled to relief because the state court decision denying this claim was reasonable and entitled to deference under federal law.

---

[4] As the magistrate judge explained, Ground Nine appeared to assert the same *Brady* claim as Ground One.

As to Ground Two—Bell's jury instruction claim related to Florida's "stand your ground" law—the magistrate judge determined that the claim was procedurally barred for two reasons: (1) Bell had not clearly indicated in his Rule 3.850 motion that he intended to bring this challenge under federal law, and (2) the state court had rejected the claim based "on an independent and adequate procedural default principle of state law." Doc. 46 at 47.

The magistrate judge then considered whether Bell was entitled to review of the procedurally defaulted claim. She explained that there was a "fundamental miscarriage of justice exception," which allowed review of a procedurally defaulted claim when a petitioner could show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Id.* at 47–48 (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). To establish entitlement to review of a defaulted claim based on actual innocence, the petitioner had to come forward with "new reliable evidence . . . that was not presented at trial" and show that with this new evidence it was "more likely than not that no reasonable juror would have convicted him." *Id.* at 48 (quoting *Schlup*, 513 U.S. at 327).

The magistrate judge considered whether Bell's newly discovered evidence—Johnson's statements to Alverson during the hospital interview and Brand's witness statement—established his actual innocence. She explained that the new evidence related to whether Bell acted in self-defense, which was a complete affirmative defense to the charged crime. She noted that this Court had

not yet decided whether a petitioner could establish his actual innocence "based on new reliable evidence of a complete affirmative defense." *Id.* (internal quotation marks omitted). The magistrate judge did not resolve this issue. Instead, she concluded that, even assuming the fundamental-miscarriage-of-justice exception could apply when the newly discovered evidence related to an affirmative defense, Bell had not shown it was more likely than not that no reasonable juror would have convicted him if the jury had heard about Johnson's statements to Alverson or Brand's eyewitness report.

For Ground Three—the claim that trial counsel was ineffective in waiving Bell's presence at a pretrial deposition—the magistrate judge determined that the claim was procedurally defaulted because Bell failed to raise it in his post-conviction appellate brief. And he had not demonstrated that he was entitled to federal review of this procedurally defaulted claim based on the fundamental-miscarriage-of-justice exception.

The magistrate judge concluded that Ground Five—the claim that Bell's appellate counsel was ineffective for failing to move to reopen proceedings after learning of Johnson's suppressed statements—also was procedurally defaulted. She acknowledged that Bell had raised an ineffective assistance of appellate counsel claim in his Rule 3.850 motion but concluded that the state court rejected it based on a state law procedural bar. She explained that under Florida law an ineffective assistance of appellate counsel claim had to be raised in a petition filed with the District Court of

Appeal where the direct appeal was taken. *See* Fla. R. App. P. 9.141(d)(3).

The magistrate judge then considered whether Bell presented this particular ineffective assistance of appellate counsel claim in the habeas petition he filed in the First District Court of Appeal. After reviewing that petition, she concluded that Bell had raised no claim that appellate counsel was ineffective in failing to reopen the criminal case. She further determined that Bell could not return to the Florida appellate court to present this claim because it would be time barred.

The magistrate judge also rejected as procedurally defaulted the claims in Ground Seven—alleging that the State had struck all potential Black jurors—and Grounds Ten and Eleven—alleging that the prosecutor had engaged in misconduct during closing arguments. According to the magistrate judge, Bell procedurally defaulted these claims because he failed to raise them on direct appeal.

After making these recommendations, the magistrate judge notified the parties that any objections had to be filed within 14 days. She warned that failing to object to her "findings or recommendations . . . waive[d] the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." Doc. 46 at 77.

Bell filed objections. His objections included that the magistrate judge erred in concluding that (1) the state court decision rejecting his *Brady* claim was reasonable, and (2) he could not

overcome any procedural default based on newly discovered evidence showing his actual innocence. Even liberally construed, however, the objections did not challenge the magistrate judge's determination that Bell had procedurally defaulted the claim in Ground Five alleging ineffective assistance of appellate counsel.

After considering Bell's objections, the district court adopted the magistrate judge's recommendation and denied the petition. It refused to issue a certificate of appealability.

Bell appealed. A member of this court granted Bell a certificate of appealability on the following issues:

> (1) Whether the district court properly determined that the state court reasonably concluded that Bell failed to satisfy the materiality prong of his *Brady* . . . claim in Grounds 1 and 9?

> (2) Whether the district court properly determined that Bell failed to satisfy the fundamental-miscarriage-of-justice exception to overcome his procedural default [of the claims raised in] Grounds 2, 3, 7, 10, and 11?

> (3) Whether the district court properly determined that the state court had rejected [the claim in] Ground 5 . . . based on [Florida Rule of Appellate Procedure] 9.141(d)(3) and that the rule constituted an independent and adequate state procedural ground?

We appointed counsel to represent Bell on appeal.

## II.

We review *de novo* a district court's denial of a petition for a writ of habeas corpus. *Morrow v. Warden, Ga. Diagnostic Prison*, 886 F.3d 1138, 1146 (11th Cir. 2018).

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs our review of federal habeas petitions. *See* 28 U.S.C. § 2254(d). "AEDPA prescribes a highly deferential framework for evaluating issues previously decided in state court." *Sears v. Warden GDCP*, 73 F.4th 1269, 1279 (11th Cir. 2023). Under AEDPA, a federal court may not grant habeas relief on claims that were "adjudicated on the merits in [s]tate court" unless the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established [f]ederal law, as determined by the Supreme Court of the United States" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding." 28 U.S.C. § 2254(d).

A state court decision is "contrary to" clearly established law if the court "applie[d] a rule that contradicts the governing law" set forth by the United States Supreme Court or the state court confronted facts that were "materially indistinguishable" from United States Supreme Court precedent but arrived at a different result. *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000). To meet the unreasonable-application-of-law standard, "a prisoner must show far more than that the state court's decision was merely wrong or even clear error." *Shinn v. Kayer*, 592 U.S. 111, 118 (2020) (internal quotation marks omitted). The decision must be "so obviously wrong

that its error lies beyond any possibility for fairminded disagreement." *Id.* (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). This standard is "difficult to meet and . . . demands that state-court decisions be given the benefit of the doubt." *Raulerson v. Warden*, 928 F.3d 987, 996 (11th Cir. 2019) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011)).

We also must defer to a state court's determination of facts unless its decision "was based on an unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding." 28 U.S.C. § 2254(d)(2). "We may not characterize . . . state-court factual determinations as unreasonable merely because we would have reached a different conclusion in the first instance." *Brumfield v. Cain*, 576 U.S. 305, 313–14 (2015) (alteration adopted) (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)). We presume that a state court's factual determinations are correct, absent clear and convincing evidence to the contrary. *See Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1035 (11th Cir. 2022) (en banc).

We review *de novo* a district court's determination that a claim was procedurally defaulted. *Ward v. Hall*, 592 F.3d 1144, 1175 (11th Cir. 2010).

On each claimed basis for relief, we review "the last state-court adjudication on the merits." *Greene v. Fisher*, 565 U.S. 34, 40 (2011). If the last state court to render a decision did so without opinion, we must "look through" it to the last related state court decision that provided reasoning and presume that the higher state

court implicitly adopted it. *Wilson v. Sellers*, 584 U.S. 122, 125 (2018).

We liberally construe *pro se* litigants' pleadings, holding them "to less stringent standards than formal pleadings drafted by lawyers." *Campbell v. Air Jam. Ltd.*, 760 F.3d 1165, 1168 (11th Cir. 2014).

### III.

On appeal, Bell raises three challenges to the district court's order denying his § 2254 petition. First, he argues that the district court erred in concluding that the state court reasonably rejected the *Brady* claim raised in Grounds One and Nine of his petition. Second, he says that the district court erred in concluding that he failed to satisfy the fundamental-miscarriage-of-justice exception and overcome the procedural default of the claims asserted in Grounds Two, Three, Seven, Ten, and Eleven of his petition. Third, he argues that the district court erred in determining that the claim asserted in Ground Five was procedurally defaulted. We address each issue in turn.

### A.

We begin with Bell's argument that the state court unreasonably rejected his *Brady* claim. In *Brady*, the Supreme Court recognized that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." 373 U.S. at 87. The Court has since clarified that a defendant need not request

favorable evidence from the prosecution to be entitled to it. *See Kyles v. Whitley*, 514 U.S. 419, 433 (1995).

When the "government suppresses evidence that is favorable to the defense," the defendant is entitled to a new trial if he establishes that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Smith v. Sec'y, Dep't. of Corr.*, 572 F.3d 1327, 1334 (11th Cir. 2009) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). "A reasonable probability of a different result exists when the government's evidentiary suppressions, viewed cumulatively, undermine confidence in the guilty verdict." *Id.* (internal quotation marks omitted).

Here, Bell cannot show that the state postconviction court unreasonably applied *Brady* when it determined that he failed to establish the suppressed evidence's materiality. The state court properly asked whether there was a reasonable probability that the jury would have reached a different verdict if the State had disclosed Alverson's report containing Johnson's statements from the hospital interview. The state court acknowledged that the report showed that Johnson had made prior inconsistent statements, and thus it could have been used to impeach Johnson's trial testimony about how the fight with Bell started. But the state court nevertheless determined that the suppressed statements were not material because they did not cast doubt upon other evidence showing that Bell continued to hit Johnson with a bat while Johnson was on the ground and no longer threatening him. Importantly, Bell's own

testimony established that he continued to hit Johnson with the bat once Johnson no longer posed any threat, meaning he was no longer justified in using deadly force. Given Bell's testimony, we cannot say that the state court's decision on materiality was "so obviously wrong that its error lies beyond any possibility for fair-minded disagreement." *Shinn*, 592 U.S. at 118 (internal quotation marks omitted).

## B.

We next consider Bell's argument regarding Grounds Two, Three, Seven, Ten, and Eleven. The district court concluded that these claims were procedurally defaulted and that any procedural default was not excused based on the fundamental-miscarriage-of-justice exception. On appeal, Bell challenges the district court's determination that the exception did not apply.

Before bringing a habeas petition in federal court, a state prisoner must exhaust all state court remedies that are available for challenging his conviction, either on direct appeal or in a state post-conviction motion. *See* 28 U.S.C. § 2254(b)(1)(A). When a petitioner failed to raise his federal claim in state court, the exhaustion requirement generally is not satisfied. *See Gray v. Netherland*, 518 U.S. 152, 162–63 (1996); *Bailey v. Nagle*, 172 F.3d 1299, 1303 (11th Cir. 1999).

When a claim is procedurally defaulted, a federal court may nonetheless address the merits if the petitioner can show cause for the default and prejudice resulting from it. *Wainwright v. Sykes*, 433 U.S. 72, 84 (1977). Even when a petitioner cannot show cause

and prejudice, the merits of his defaulted claim may still be considered if he can show a fundamental miscarriage of justice. *Schlup*, 513 U.S. at 314–15. To establish that this exception applies, a petitioner must "show that it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt." *Id.* at 327. The Supreme Court has cautioned that a successful miscarriage-of-justice claim is "extremely rare." *Id.* at 321. And we have explained that "factual innocence"—rather than mere "legal innocence"—is required for the exception to apply. *Rozelle v. Sec'y, Fla. Dept. of Corr.*, 672 F.3d 1000, 1013 (11th Cir. 2012).

Bell argues on appeal that his procedural default should be excused because he has established a fundamental miscarriage of justice. He says that newly discovered evidence—Johnson's statements contained in Alverson's report—shows that he was acting in self-defense.[5] We have not previously addressed whether evidence establishing a complete affirmative defense establishes a defendant's factual—as opposed to legal—innocence.

We leave this question for another day. Even assuming that evidence establishing that a defendant was acting in self-defense means that he is factually innocent of the charges against him, the miscarriage-of-justice exception would not apply to excuse Bell's procedural default. He has not shown that "it is more likely than

---

[5] On appeal, the only new evidence that Bell discusses is Johnson's statement in Alverson's report. In arguing that new evidence established his actual innocence, he does not mention the eyewitness report from Brand. We thus limit our analysis to Johnson's statement.

not that no reasonable juror would have" found that he was not acting in self-defense after considering Alverson's report. *Schlup*, 513 U.S. at 327. True, the report could have been used to impeach Johnson's testimony. But Bell's own admissions established that he continued to hit Johnson with the bat once Johnson no longer posed any threat. Given this testimony, it is likely that a reasonable juror still would have concluded that Bell was not acting in self-defense and therefore convicted him. So the district court was correct to conclude that Bell's procedural default of the claims raised in Grounds Two, Three, Seven, Ten, and Eleven was not excused.

## C.

We now turn to Bell's final argument. He says that the district court erred in concluding that his ineffective assistance of appellate counsel claim asserted in Ground Five was procedurally defaulted.

A claim is procedurally defaulted if it is barred by an adequate and independent state procedural ground. *See Wainwright*, 433 U.S. at 81–82. For a state court's rejection of a claim to rest on independent and adequate state procedural grounds, the state court must have "clearly and expressly" stated that its judgment rested on a state procedural bar. *Harris v. Reed*, 489 U.S. 255, 263 (1989).

Bell argues that the state circuit court's order denying his Rule 3.850 motion did not clearly and expressly state that the court was relying on a Florida procedural bar to deny his ineffective assistance of appellate counsel claim. He thus asserts that the district

court erred in concluding that this claim was procedurally defaulted.

We cannot reach this issue because Bell did not preserve it for our review. The magistrate judge recommended that the district court deny this claim because the state court had rejected it on an adequate and independent state procedural ground. Bell then objected. But even liberally construing his objections, we cannot say that he challenged this aspect of the recommendation.

A party who does not object to findings or recommendations in a report and recommendation generally waives the right to challenge an order based on those conclusions if the party was informed of the time for objections and the consequences of failing to do so. 11th Cir. R. 3-1. But we may review the issue for plain error if necessary in the interests of justice. *Id.*

Here, Bell waived the right to challenge the district court's decision that the claim in Ground Five was procedurally barred. He failed to object to this aspect of the magistrate judge's recommendation after the magistrate judge informed Bell of the deadline for objections and warned him of the consequences of failing to object. Bell has not argued—and cannot show—that reviewing the issue for plain error is necessary in the interests of justice. *See id.* We thus affirm as to this issue as well.

**AFFIRMED.**